# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

LA DELL GRIZZELL,

*Plaintiff-Appellant*,

JOHN DOE, Minor #1; Minor #2, Minor #3,

*Plaintiffs*,

v.

SAN ELIJO ELEMENTARY SCHOOL; SAN MARCOS UNIFIED SCHOOL DISTRICT,

*Defendants-Appellees*.

———————

On Appeal from the United States District Court for Southern California,
No. 3:21-cv-00863-CAB-MDD

———————

## APPELLANT'S REPLACEMENT OPENING BRIEF
———————

CARTER C. WHITE
UC DAVIS SCHOOL OF LAW
CIVIL RIGHTS CLINIC
One Shields Avenue, Bldg. TB-30
Davis, CA 95616

ERIN E. MURPHY
 *Counsel of Record*
MARIEL A. BROOKINS*
ZACHARY J. LUSTBADER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Supervised by principals of the firm
who are members of the Virginia bar

*Counsel for Plaintiff-Appellant*

December 4, 2023

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

TABLE OF AUTHORITIES ......................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................................. 1

INTRODUCTION ................................................................................. 2

STATEMENT OF JURISDICTION ............................................................ 6

STATEMENT OF THE ISSUES ............................................................... 6

STATEMENT OF THE CASE ................................................................... 6

    A.    Legal Background ................................................................ 6

    B.    Factual Allegations .............................................................. 9

    C.    Procedural History ............................................................. 15

SUMMARY OF ARGUMENT ................................................................ 18

STANDARD OF REVIEW ................................................................... 22

ARGUMENT ..................................................................................... 22

I.    *Johns* Must Be Overruled. .......................................................... 22

    A.    *Johns* Is Egregiously Wrong ............................................. 24

        1.    Federal and state law keep the courthouse doors open to children even when their parents cannot afford an attorney ................................................................. 24

        2.    *Johns'* cursory reasoning to the contrary is indefensible ......................................................................... 29

        3.    *Johns* violates the constitutional rights of parents and minors .......................................................... 35

    B.    *Johns* Leads to Punitive and Bizarre Results, Especially for Poor Children ............................................................. 40

        1.    *Johns'* extralegal policy rationales make an unattainable perfect the enemy of the good ............................. 40

i

2.     Minors need not—and often cannot—wait until the age of majority to bring suit ............................................................ 46

II.    *En Banc* Review Is Warranted ..................................................................... 48

    A.    *Johns* Squarely Conflicts with the Decisions of Other Circuits ............................................................................................. 49

    B.    The Issue of Equal Access to the Federal Courts Is Exceedingly Important, Particularly for Plaintiffs Like the Grizzells.............................................................................................. 53

CONCLUSION ..................................................................................................... 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Adams ex rel. D.J.W. v. Astrue*,
  659 F.3d 1297 (10th Cir. 2011) ........................................................... 51

*Agyeman v. Corr. Corp. of Am.*,
  390 F.3d 1101 (9th Cir. 2004) ............................................................. 45

*Alvarez v. Hill*,
  518 F.3d 1152 (9th Cir. 2008) ............................................................. 15

*Aronson v. Superior Court*,
  236 Cal.Rptr. 347 (Cal. Ct. App. 1987) ......................... 27, 32, 46, 47

*Babb v. Wilkie*,
  140 S.Ct. 1168 (2020) .......................................................................... 47

*Bank of the United States v. Ritchie*,
  33 U.S. (8 Pet.) 128 (1834) ................................................................. 32

*Benavidez v. County of San Diego*,
  993 F.3d 1134 (9th Cir. 2021) ............................................................... 9

*Boddie v. Connecticut*,
  401 U.S. 371 (1971) .............................................................................. 53

*Booth v. United States*,
  914 F.3d 1199 (9th Cir. 2019) ............................................................. 47

*C.D. v. S.L.*,
  2022 WL 481259 (Cal. Ct. App. Feb. 17, 2022) ............................... 26

*C.E. Pope Equity Tr. v. United States*,
  818 F.2d 696 (9th Cir. 1987) ......................................................... 8, 34

*Chambers v. Balt. & Ohio R.R. Co.*,
  207 U.S. 142 (1907) .............................................................................. 38

*Cheung v. Youth Orchestra Found. of Buffalo, Inc.*,
  906 F.2d 59 (2d Cir. 1990) ......................................................... *passim*

iii

*Cloud v. Market St. Ry. Co.*,
168 P.2d 191 (Cal. Ct. App. 1946) ................................................................ 28, 29

*County of Los Angeles v. Superior Court*,
111 Cal.Rptr.2d 471 (Cal. Ct. App. 2001) ...................................... 28, 29, 30, 47

*De Los Santos v. Superior Court*,
613 P.2d 233 (Cal. 1980) ........................................................................ 27, 28, 29

*Dietrich v. Boeing Co.*,
14 F.4th 1089 (9th Cir. 2021)................................................................................48

*Dobbs v. Jackson Women's Health Org.*,
142 S.Ct. 2228 (2022)................................................................................... 24, 40

*Dred Scott v. Sandford*,
60 U.S. (19 How.) 393 (1857) ............................................................................38

*Duarte v. Figueroa*,
2006 WL 708994 (N.D. Cal. Mar. 21, 2006)................................................ 41, 42

*Elustra v. Mineo*,
595 F.3d 699 (7th Cir. 2010)....................................................................... 23, 52

*Employment Div. v. Smith*,
494 U.S. 872 (1990).............................................................................................35

*Erickson v. Pardus*,
551 U.S. 89 (2007)...............................................................................................45

*Faretta v. California*,
422 U.S. 806 (1975)................................................................................... *passim*

*Griffin v. Illinois*,
351 U.S. 12 (1956)...............................................................................................53

*Harris v. Apfel*,
209 F.3d 413 (5th Cir. 2000)...............................................................................51

*Howlett v. Rose*,
496 U.S. 356 (1990).............................................................................................42

*Iannaccone v. Law*,
142 F.3d 553 (2d Cir. 1998) .............................................. 24, 36, 37, 38

*In re Christina B.*,
23 Cal.Rptr.2d 918 (Cal. Ct. App. 1993) ..................................... 27, 28

*In re Josiah Z.*,
115 P.3d 1133 (Cal. 2005) ...................................................28

*In re M.F.*,
74 Cal.Rptr.3d 383 (Cal. Ct. App. 2008) ............................... 19, 28, 30

*In re Marriage of Caballero*,
33 Cal.Rptr.2d 46 (Cal. Ct. App. 1994) ........................................27

*In re Moore*,
209 U.S. 490 (1908) ...................................................... 39, 40

*J.W. v. Superior Court*,
22 Cal.Rptr.2d 527 (Cal. Ct. App. 1993) ......................................29

*Johns v. County of San Diego*,
114 F.3d 874 (9th Cir. 1997) ............................................ *passim*

*Key Bank of Wash. v. S. Comfort*,
106 F.3d 1441 (9th Cir. 1997) ................................................22

*Lampkin v. District of Columbia*,
27 F.3d 605 (D.C. Cir. 1994) ................................................12

*M.L.B. v. S.L.J.*,
519 U.S. 102 (1996) .........................................................39

*Machadio v. Apfel*,
276 F.3d 103 (2d Cir. 2002) .................................................51

*Mahanoy Area Sch. Dist. v. B.L.*,
141 S.Ct. 2038 (2021) .......................................................42

*Meeker v. Kercher*,
782 F.2d 153 (10th Cir. 1986) ...............................................7

*Meyer v. Nebraska*,
   262 U.S. 390 (1923)......................................................................36

*Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*,
   297 F.3d 195 (2d Cir. 2002) ..................................................... 51, 52

*O'Reilly v. N.Y. Times Co.*,
   692 F.2d 863 (2d Cir. 1982) ......................................................25

*Osborn v. Bank of the United States*,
   22 U.S. (9 Wheat.) 738 (1824) ..................................................34

*Osei-Afriyie v. Medical College*,
   937 F.2d 876 (3d Cir. 1991) ............................................... *passim*

*Palmer v. Valdez*,
   560 F.3d 965 (9th Cir. 2009) ...................................................3, 41

*Parham v. J.R.*,
   442 U.S. 584 (1979)....................................................... 31, 36, 46

*Payne v. Tennessee*,
   501 U.S. 808 (1991)....................................................................24

*Pearson v. Callahan*,
   555 U.S. 223 (2009)....................................................... 22, 23, 54

*Penhallow v. Doane's Adm'rs*,
   3 U.S. (3 Dall.) 54 (1795) .........................................................25

*Pierce v. Soc'y of Sisters*,
   268 U.S. 510 (1925)............................................................ 31, 36

*Quilloin v. Walcott*,
   434 U.S. 246 (1978)....................................................................35

*Raming v. Metro. St. Ry. Co.*,
   57 S.W. 268 (Mo. 1900).............................................................39

*Ramos v. Louisiana*,
   140 S.Ct. 1390 (2020)................................................................22

*Raskin v. Dallas Indep. Sch. Dist.*,
   69 F.4th 280 (5th Cir. 2023) ............................................................... *passim*

*Rowland v. Cal. Men's Colony*,
   506 U.S. 194 (1993) ............................................................ 34

*Santosky v. Kramer*,
   455 U.S. 745 (1982) ............................................................ 36

*Shepherd v. Wellman*,
   313 F.3d 963 (6th Cir. 2002) .............................................. 34

*Smith v. Org. of Foster Fams. for Equality & Reform*,
   431 U.S. 816 (1977) ............................................................ 25

*Tennessee v. Lane*,
   541 U.S. 509 (2004) ............................................................ 39

*Tindall v. Poultney High Sch. Dist.*,
   414 F.3d 281 (2d Cir. 2005) ................................ 35, 52, 53

*Tinker v. Des Moines Indep. Comm. Sch. Dist.*,
   258 F.Supp. 971 (S.D. Iowa 1966) .................................. 42

*Troxel v. Granville*,
   530 U.S. 57 (2000) .............................................................. 35

*United States v. 30.64 Acres of Land*,
   795 F.2d 796 (9th Cir. 1986) .............................................. 27

*United States v. Gaudin*,
   515 U.S. 506 (1995) ............................................................ 23

*United States v. Hayes*,
   231 F.3d 1132 (9th Cir. 2000) ............................................ 48

*United States v. Plattner*,
   330 F.2d 271 (2d Cir. 1964) .............................................. 36

*Vance v. Vance*,
   108 U.S. 514 (1883) ............................................................ 47

*Vasquez v. Hillery*,
   474 U.S. 254 (1986)........................................................................23

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998)........................................................47

*Weston Family P'ship, LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022)............................................................6

*Williams v. Superior Court*,
   54 Cal.Rptr.3d 13 (Cal. Ct. App. 2007) ................................ 27, 32, 45

*Willis v. City of Salem*,
   404 F.App'x 116 (9th Cir. 2010)......................................................15

**Constitutional Provisions**

U.S. Const. amend. V.................................................................. 37

U.S. Const. amend. XIV ...............................................................38

**Statutes**

28 U.S.C. §1654................................................................. *passim*

42 U.S.C. §11431(1) .......................................................................9

42 U.S.C. §11432(g)(1)................................................................ 12

42 U.S.C. §11432(g)(3)..................................................................13

42 U.S.C. §11432(g)(4)..................................................................12

Civil Rights Act of 1866, ch. 31, 14 Stat. 27 ....................................... 38

Judiciary Act of 1789, ch. 20, 1 Stat. 73 ........................................... 3, 25

Cal. Code Civ. Pro. §372(a)(1) ...................................................... 26

Cal. Code Civ. Pro. §372(a)(3) ................................................ 28, 44, 45

Cal. Fam. Code §3006.................................................................. 32

Cal. Fam. Code §6601................................................................. *passim*

Mass. Body of Liberties art. 26 (1641) ..................................37

**Rules**

Fed. R. App. P. 35(b)(1) ......................................48

Fed. R. App. P. 47 ................................................23

Fed. R. Civ. P. 17(b) ........................................4, 26

Fed. R. Civ. P. 17(c) ........................................ 16, 25

Fed. R. Civ. P. 55(b)(2) ......................................44

S.D. Cal. Local Civ. R. 17.1(a) ..........................44

Cal. R. Ct. 8.548 ................................................ 29

Model R. Prof. Cond. 1.2(a) .......................... 30, 45

Model R. Prof. Cond. 1.16(a)(3) ...................... 30

**Other Authorities**

Akhil Reed Amar, *Women and the Constitution*, 18 Harv. J.L. &
    Pub. Pol'y 465 (1994) ...............................................38

Benjamin H. Barton & Stephanos Bibas, *Triaging Appointed-Counsel
    Funding and Pro Se Access to Justice*, 160 U. Pa. L. Rev. 967
    (2012) .......................................................... 44

43 C.J.S. *Infants* (2023 update) ........................................25

Franz Kafka, *The Trial* (Breon Mitchell trans., 1998) (1925) ...................5

John E. Kennedy, *Federal Rule 17(b) and (c): Qualifying to Litigate
    in Federal Court*, 43 Notre Dame L. Rev. 273 (1968) .......................26

L. Servs. Corp., *The Justice Gap: Measuring the Unmet Civil Legal
    Needs of Low-Income Americans* (June 2017) ................................ 41

Anthony Lewis, *Gideon's Trumpet* (1964)................................44

Lisa V. Martin, *No Right to Counsel, No Access Without: The Poor
    Child's Unconstitutional Catch-22*, 71 Fla. L. Rev. 831 (2019)........ 5, 31, 41, 43

Nancy J. Moore, *Conflicts of Interests in the Representation of Children*, 64 Fordham L. Rev. 1819 (1996) .......................................26

Note, *The Right to Counsel in Civil Litigation*, 66 Colum. L. Rev. 1322 (1966)........................................................................... 37

Thomas Paine on Bill of Rights (1777) ................................................. 38

Deborah L. Rhode, *Access to Justice*, 69 Fordham L. Rev. 1785 (2001)........................................................................................43

Rebecca L. Sandefur, *Access to What?*, 148 Dædalus 49 (Winter 2019)................................................................................44

Robert I. Weil et al., Cal. Practice Guide: Civil Procedure Before Trial.................27

Wright & Miller, Fed. Prac. & Proc. Civ. (2023 update)................................. 26, 39

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant requests oral argument. This case raises important questions about a parent's constitutional right to direct the affairs of his or her child, equal access to the courts under the Due Process and Equal Protection clauses, and this Court's contrary—and contrary to law—precedent in *Johns v. County of San Diego*, 114 F.3d 874 (9th Cir. 1997).

# INTRODUCTION

La Dell Grizzell is the mother of three young children who were admitted to San Elijo Elementary School through a federal education program for homeless youth. At San Elijo, her children—each of whom was the only black student in his or her class—suffered from cruel, demeaning, and outright racist mistreatment. While under the supervision of his third-grade teacher, John Doe #1 had a "for sale" sign placed around his neck by other students and on the playground was subjected to taunts that "blackies don't count."[1] ER330-31, ER352. Jane Doe #2 had her lunch thrown in the garbage because, she was told, "black people are trash." ER336-37. John Doe #3's first-grade teacher insisted that "certain demographics," referring to her only black student, come to school "not properly fed." ER341. When she learned about this harassment, Ms. Grizzell did what any mother would: She complained, she fought, and—when all else failed—she sued.

To the district court below, however, the Grizzells' allegations were irrelevant. The court did not liberally construe the *pro se* complaint; nor did it evaluate whether any of the Grizzells' allegations of gross discrimination state a plausible claim for relief. Rather, the court informed Ms. Grizzell that, under binding Circuit precedent, she was categorically barred from bringing this lawsuit because she cannot bring

---

[1] Ms. Grizzell's children are proceeding pseudonymously. Collectively, the three are referred to as the "Grizzell children," and, together with Ms. Grizzell, "the Grizzells."

claims *pro se* on behalf of her children, even though she is their legal guardian and cannot afford to hire an attorney.

That harsh rule leaves families like the Grizzells trapped in a Catch-22. Indigent parties to civil cases have no general right to counsel. *See Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009). So to pursue their claims in court, plaintiffs like the Grizzells typically proceed *pro se*.[2] In California, as elsewhere, however, minors are legally incapable of suing in their own name. "[A] guardian must conduct the action or proceedings" in the child's stead. Cal. Fam. Code §6601. But under this Court's decision in *Johns v. County of San Diego*, 114 F.3d 874 (9th Cir. 1997), Ms. Grizzell could not bring her children's action under §6601 unless she *also* retained an attorney, purportedly because—even though the law expressly empowers her to "conduct" her children's lawsuit—bringing suit *pro se* would constitute the unauthorized practice of law. *Id.* at 877. So under *Johns*, neither Ms. Grizzell, who cannot afford an attorney, nor her children, who lack the legal capacity to bring an action on their own, can proceed at all.

That rule is as mistaken as it is misguided. Since the Judiciary Act of 1789, all plaintiffs, including minors, have held the right to conduct their actions "personally," *i.e.*, *pro se*. Judiciary Act of 1789, ch. 20, §35, 1 Stat. 73, 92; *see* 28

---

[2] Undersigned counsel were appointed by the Court "for purposes of this appeal only." Dkt.23.

U.S.C. §1654. California law, which controls here, *see* Fed. R. Civ. P. 17(b), vests litigation authority in children's parents by providing that "[a] minor may enforce the minor's rights by civil action or other legal proceedings *in the same manner* as an adult, except that a guardian" must be the one to exercise those powers in "conduct[ing]" the action. Cal. Fam. Code §6601 (emphasis added). That necessarily includes the power to proceed *pro se*; otherwise a minor could not proceed "in the same manner as an adult."

*Johns* resisted that conclusion on the theory that "a non-lawyer has no authority to appear as an attorney for others than himself." *Johns*, 114 F.3d at 887 (quotation marks omitted). But a parent does not transmogrify into a lawyer simply by prosecuting her child's claims as stand-in principal. *Johns*' false equivalence of the parent-child and attorney-client relationships deprives all nonlawyer parents of their right to conduct a lawsuit for their children *pro se*, and in the vast majority of cases involving minors from indigent families robs children of any opportunity to have their day in court at all. Nothing in §1654 compels such a harsh rule, and to the extent it did, it would plainly be unconstitutional, abridging fundamental rights held by parents and their children alike while imposing a *de facto* bar on indigent minors' access to the courts.

*Johns* should be overruled. As this case vividly illustrates, it not only is profoundly wrong but has the perverse effect of producing wholesale denial of the

very access to justice that it purports to be protecting. *See* Lisa V. Martin, *No Right to Counsel, No Access Without: The Poor Child's Unconstitutional Catch-22*, 71 Fla. L. Rev. 831 (2019). *Johns* tried to sidestep that problem by suggesting that minors can just obtain *pro bono* counsel. But *Johns* both wildly overestimated the prospects of securing free legal representation for all minor plaintiffs and unfairly underestimated the capability of *pro se* parents to competently conduct their children's lawsuits as the law entrusts them to do. The solution to scarcity in legal services cannot be to turn away plaintiffs like the Grizzells at the courthouse doors just because they are not fortunate enough to secure *pro bono* counsel. It also cannot be to delay adjudication of minors' claims until they are 18, when limitations periods may have long since run and irreparable harms may have already come to pass. Instead, courts can and should apply all the usual practices to hold *pro se* plaintiffs to their burden, enforce applicable safeguards that secure the interests of minors, and facilitate the civil actions of legally untrained parties.

*     *     *

The Grizzells sought to vindicate their federal rights under a statute guaranteeing a public education for homeless minors. But under *Johns*, the Grizzell children could not even attempt to assert those rights in federal court—precisely *because they are indigent minors*. It does not get more Kafkaesque than that. *Accord* Franz Kafka, *The Trial* 217 (Breon Mitchell trans., 1998) (1925) ("[T]his entrance

[to the law] was meant solely for you.  I'm going to go and shut it now.").  When a judicially created rule has such untenable implications, at the very least, it deserves a second look.  This Court should accordingly hear Ms. Grizzell's appeal *en banc* in the first instance.  The Court should then overrule *Johns* and reverse the district court's perfunctory dismissal below.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§1331, 1343, and 1367.  This Court has jurisdiction under 28 U.S.C. §1291.  Notice of appeal was filed in the district court on September 1, 2021, and the district court entered judgment for defendant and closed the case on October 13, 2021.  ER520; *see Weston Family P'ship, LLLP v. Twitter, Inc.*, 29 F.4th 611, 618 (9th Cir. 2022).

## STATEMENT OF THE ISSUES

1. Whether a guardian suing in federal court, when vested with the power to "conduct" her child's lawsuit, Cal. Fam. Code §6601, must "conduct" the case "by counsel" or may instead "conduct" the case "personally," 28 U.S.C. §1654.

2. Whether *Johns v. County of San Diego*, 114 F.3d 874 (9th Cir. 1997), should be overruled.

## STATEMENT OF THE CASE

### A.    Legal Background

Section 35 of the Judiciary Act of 1789, codified in current form at 28 U.S.C. §1654, provides:  "In all courts of the United States the parties may plead and

conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct cases therein."  The right to proceed "personally" is the right to self-representation, that is, to proceed *pro se*. *See Faretta v. California*, 422 U.S. 806, 813 (1975).

While nothing in that statutory text purports to preclude a guardian from conducting a case personally on behalf of minor or other legally incapacitated individual, this Court nevertheless decided to do so 26 years ago in *Johns v. County of San Diego*, 114 F.3d 874 (9th Cir. 1997).  There, Hans Johns brought a suit "pro se as the 'natural biological father of Casey Johns, a minor,'" alleging violations of Casey's constitutional rights.  *Id.* at 876.  The district court appointed Johns as guardian *ad litem* but ordered that he could proceed only if he secured counsel. When Johns failed to do so, the court dismissed the complaint.

This Court affirmed, following the lead of three circuits—the Second, Third, and Tenth—that had held (albeit in rather cursory fashion) "that the guardian or parent cannot bring a lawsuit on behalf of a minor in federal court without retaining a lawyer." *Id.* (citing *Osei-Afriyie v. Medical College*, 937 F.2d 876, 882-83 (3d Cir. 1991); *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61-62 (2d Cir. 1990); *Meeker v. Kercher*, 782 F.2d 153, 154 (10th Cir. 1986) (per curiam)). The fulcrum of the analysis in *Johns* comes from a paragraph from *Osei-Afriyie*, in which the Third Circuit acknowledged that "[a] litigant in federal court has a right

to act as his or her own counsel," *id.* at 876 (quoting *Osei-Afriyie*, 937 F.2d at 882 (citing 28 U.S.C. §1654)), but nevertheless held that "a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child." *Id.* The federally protected "choice to appear pro se," the Third Circuit maintained, "is not a true choice for minors who under state law, *see* Fed.R.Civ.P. [17(b)[3]], cannot determine their own legal actions." *Id.* Reasoning that there is "no individual choice to proceed pro se for courts to respect," the Third Circuit posited that the "sole policy at stake concerns the exclusion of non-licensed persons to appear as attorneys on behalf of others." *Id.* And it summarily declared that "[i]t goes without saying that it is not in the interest of minors or incompetents that they be represented by non-attorneys." *Id.*

*Johns* further relied on the general rule that a non-lawyer cannot "appear as an attorney for others than himself." *Id.* at 877 (quoting *C.E. Pope Equity Tr. v. United States*, 818 F.2d 696, 697 (9th Cir. 1987)). Johns' attempted *pro se* suit, in the Court's view, fell "squarely within the ambit of the principles that militate against allowing non-lawyers to represent others in court." *Id.* The Court therefore adopted a categorical rule that "a parent or guardian cannot bring an action on behalf of a

---

[3] The block quotation in *Johns* erroneously alters the original to Rule "1(b)." *Johns*, 114 F.3d at 876.

minor child without retaining a lawyer," insisting that "representation of others" should be limited "to licensed attorneys authorized to practice before the court." *Id.*

## B. Factual Allegations

Ms. Grizzell enrolled her three children in San Elijo Elementary School ("San Elijo"), part of the San Marcos Unified School District ("the District"), between 2014 and 2015. ER326-27; SER66.[4] She did so through the McKinney-Vento Homeless Assistance Act, which guarantees "each homeless youth … equal access to the same free, appropriate public education … as provided to other children and youths." 42 U.S.C. §11431(1).

From the start, the school was hostile to the Grizzell children's enrollment. San Elijo initially responded that it could not accept "paperwork from [her] kind," *i.e.*, homeless students enrolling through McKinney-Vento. ER327. Ms. Grizzell complained to the District, which then accepted the paperwork and apologized for the school staff's behavior and miscommunication. *Id.* But that was not the end of the District's efforts to push the Grizzell children out. *See, e.g.*, SER7 (noting vice principal's remark that the Grizzell children "did not belong at his school").

---

[4] "ER" refers to Defendants' excerpts of record, Dkt.13; "SER" refers to Ms. Grizzell's contemporaneously filed supplemental record. All allegations are taken from the amended complaint Ms. Grizzell filed, which must be taken as true at this motion-to-dismiss stage. *See Benavidez v. County of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021).

Once enrolled at San Elijo, Ms. Grizzell's children found themselves to be the only black students in their respective classes. ER344, ER372; SER8. All three suffered from appalling, racist mistreatment from their fellow students, which, especially from 2018 on, the school did little to nothing to prevent. For example, when John Doe #1 played tetherball with students on the playground, his peers would change the rules whenever he started to get ahead, justifying the changes by telling him that "blackies don't count." ER331. Ms. Grizzell had to follow up with the school about the incident multiple times. ER331-35. Jane Doe #2 was slapped in the face with a lunchbox by a white student, and another student threw her food in the garbage; she was told that "black people are trash." ER336. The school's response was to have the students write an apology. ER336-37. Another student placed a sign around John Doe #1's neck stating that he was for sale, while in the direct view of their teacher. ER352. The school responded by stating that the school would make a note about "these concerns between the students"; by remarking that John Doe #1 would not be in the same class as the offending student next school year; and by assuring Ms. Grizzell that the school would conduct presentations and discussions about bullying and hatred. ER350; SER42.

For months, the pattern of discrimination continued, and Ms. Grizzell frequently followed up with the school about her concerns. *See, e.g.*, SER44 (noting further incidents in which John Doe #1 "was singled out and biased language was

utilized referencing [his] skin color"); ER352-53 (meeting discussing, among other incidents, other students "physically touching" plaintiffs' "hair" and "body"). The school district did not take serious action to remedy the situation, and faculty and staff frequently asserted prejudiced assumptions of their own. *See, e.g.*, ER341 (teacher stating that "certain demographics" come to school "not properly fed").

The situation worsened substantially during the pandemic, when San Elijo altogether failed to give the Grizzell children equal access to the school's new remote educational program. The Grizzell children were frequently unable to attend Zoom class due to technical issues exacerbated by their living situation. *E.g.*, SER200-04. They were often missing course materials, even after Ms. Grizzell repeatedly notified the school that the materials were missing. *E.g.*, ER367; SER125. Because of spotty internet connection, her children appeared on Zoom with their cameras off except when addressing a teacher, and the teachers would in response single them out and tell them to find a "hot spot," which Ms. Grizzell was unable to do. SER78-79. Due to their technical issues, the children would often be placed into Zoom breakout rooms isolated from other students. *E.g.*, ER383. And when the children *were* placed into breakout rooms alongside other students, they were frequently bullied, to the point where Ms. Grizzell requested that her children be placed in Zoom groups only with teachers present. SER81.

San Elijo responding by making the Grizzell children's access more difficult, not less. For example, when a child threatened Jane Doe #2 on Zoom, the substitute teacher responded by locking Jane Doe #2—not the other child—out of the Zoom classroom. SER153. Jane Doe #2 was too upset to attend school the following day. SER157. In another instance, Jane Doe #2 was never assigned to a Zoom reading group, only to then be criticized for not attending her reading group sessions. ER376-77.

One might think that in response to Ms. Grizzell's complaints—both as to her children's fellow students' behavior and as to the neglect of the school's teachers and staff—the school would take concrete action, consistent with its obligations under McKinney-Vento,[5] to better integrate the Grizzells into the new remote learning environment. San Elijo chose a different path. Rather than address the underlying discrimination and educational access issues, the school decided that it had grown tired of hearing from Ms. Grizzell and barred her from contacting teachers at all, directing her to speak only to the school principal. SER88. Unsurprisingly, that only

---

[5] *See, e.g.*, 42 U.S.C. §11432(g)(1)(F)(iii) (requiring local education agencies to ensure that "homeless children and youths … do not face barriers to accessing academic and extracurricular activities, including … online learning"); *id.* §11432(g)(4) ("[e]ach homeless child or youth … shall be provided services comparable to services offered to other students"). Educational rights conferred by McKinney-Vento are enforceable under 42 U.S.C. §1983. *See Lampkin v. District of Columbia*, 27 F.3d 605, 612 (D.C. Cir. 1994).

compounded the Grizzells' issues.  For example, when a teacher once again failed to provide full course materials to one of the Grizzell children, Ms. Grizzell could only engage in a protracted back-and-forth email exchange with the principal to find out how to retrieve them.  SER160-61.

After years of informal appeals to the school to better accommodate her children, Ms. Grizzell filed a *pro se* complaint in the Southern District of California on May 4, 2021.  Just ten days after Ms. Grizzell filed suit, the District informed her that it had elected to remove the Grizzell children from San Elijo and the District altogether.  ER250-52.[6]  Rather than try to aid or accommodate the Grizzell children, the school wrote that it had "determined that it is in the best interest" of her children that they be removed from the District following the end of the first full pandemic schoolyear.  ER250.

The District acknowledged that the McKinney-Vento Act requires the District to "presume that keeping the child[ren]" at San Elijo is "in [their] best interest," but it deemed the presumption rebutted.  *Id.*[7]  Specifically, the District "determined that it is <u>not</u> in the best interest of [Ms. Grizzell's] three children" to continue their enrollment for several reasons.  ER251.  First, the District cited Ms. Grizzell's

---

[6] The District's letter is erroneously dated May 14, 2020.  *See* ER250-52 (referring to current 2020-2021 schoolyear); ER388 (complaint alleging date as May 14, 2021).

[7] *See* 42 U.S.C. §11432(g)(3)(B).

"distance" from the school, claiming that this—rather than the bar on her communicating with teachers—"prevented [her] from picking up materials, supplies, and work packets for [her] children." *Id.*; *see also* ER251-52. Second, the District asserted that it was *Ms. Grizzell* who did "not allow[] [her] children to fully participate in their education" "during distance learning," because she purportedly told them not to have their video cameras on and because she declined to participate in parent-teacher conferences after the District barred her from speaking to teachers without administrator involvement. ER251. Third, the District noted—with no apparent irony—that the Grizzell children did "not appear to have a positive attachment to the school or the District," citing their absences from class. *Id.* Fourth, the District complained that Ms. Grizzell, despite her frequent outreach, purportedly "declined offers of assistance" from the school. ER252. And finally, the District thought it should "also be noted" that even though the "District has allowed [the Grizzell] children to remain enrolled" under McKinney-Vento, it could not verify Ms. Grizzell's residency status because she allegedly had "not provided the District an address." *Id.* The District explicitly declined to find that the Grizzell children failed to qualify under McKinney-Vento; it simply determined that their best interest, over Ms. Grizzell's objection, was to be disenrolled anyway. ER252-53.

## C.    Procedural History

Ms. Grizzell filed an amended complaint on May 19, 2021, in part to address the McKinney-Vento notice of disenrollment she received five days earlier. D.Ct.Dkt.7; *see* ER388.   The amended complaint raises several causes of action, including a claim under 42 U.S.C. §1983, the gravamen of which is that the District's treatment of her children violated their civil rights.[8]  Ms. Grizzell also filed a motion for preliminary injunction.

The District moved to dismiss on capacity grounds.  ER183-91.[9]   Relying principally on this Court's decision in *Johns*, the District argued that, since Ms. Grizzell "is not an attorney," she was unlawfully "attempting to bring an action for damages and request for preliminary injunction on behalf of three minor children." ER186.   Expressing concern with Ms. Grizzell's "competency" to represent her children in a lawsuit against it, the District insisted that, "[s]ince La Dell Grizzell is

---

[8] In the complaint, Ms. Grizzell specifically cites the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and McKinney-Vento, among other federal statutes.  She also cites several provisions of state law.  On remand, the complaint should be construed liberally as to all plausible causes of action it fairly raises, whether or not Ms. Grizzell cited a particular code provision.  *See Willis v. City of Salem*, 404 F.App'x 116, 116 (9th Cir. 2010) ("A pro se civil rights complaint 'need not identify the statutory or constitutional source of the claim raised in order to survive a motion to dismiss.'" (quoting *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008)).

[9] The District also filed a separate motion to dismiss on substantive and procedural grounds, ER193-223, and asserted that San Elijo is not a distinct legal entity from the District, ER204.

not an attorney licensed to practice law, she is not capable of representing her children." ER187.

Ms. Grizzell responded by arguing that, as a parent, she "has the capacity to file suit on behalf of her minor children." ER107. Parents, she explained, "are the primary people responsible for this as they have an inherent right to protect and represent their children." *Id.* Though minors lack capacity to sue on their own, Ms. Grizzell maintained that they "can … enforce their own legal rights in a civil case as long as they do so through a guardian *ad litem*," who is usually "the child's parent." *Id.* She also asserted that denying her the power to proceed "would violate the constitutional rights of the parent and child." ER102. Ms. Grizzell simultaneously petitioned to proceed as her children's guardian *ad litem*, ER88-98; *see* Fed. R. Civ. P. 17(c), noting that she had custody of all three child plaintiffs and had "no interest adverse to that of the minor[s]." ER88-91. The District opposed the request and continued to insist that Ms. Grizzell must be represented by counsel even if proceeding as guardian *ad litem*. ER47-50.

The district court held a hearing on the motion, which lasted for all of nine minutes. ER11-15. Immediately after appearances, the court began by stating that "before the Court can do anything," Ms. Grizzell "need[ed] to have counsel." ER11. The court acknowledged that "[t]here is a difference between being [the children's] guardian, and therefore, standing in their shoes as a plaintiff," on the one hand, and

16

"being an attorney," on the other. *Id.* But it declined to let Ms. Grizzell proceed because, under this Court's precedent, she does not have "the capacity to be [her children's] lawyer." *Id.*; *see also id.* ("Those are just the rules. I can't work around the rules. I can't change those rules."). The court maintained that it was not "just ignoring" Ms. Grizzell's allegations, which in its view were "serious." ER12. But the court dismissed the complaint "because of the lack of counsel, nothing to do with the merits," and further denied Ms. Grizzell's application to proceed as guardian *ad litem.* ER13-15. The court suggested that Ms. Grizzell "contact the San Diego County Bar Association or the ACLU." ER12. "[G]iven the allegations [she] ha[d] made," the court expressed "hope that [she] could find someone who would be interested in helping" her. ER14. But the court did not appoint counsel or aid Ms. Grizzell in finding an attorney. The court entered an order granting the motion to dismiss for lack of capacity and denied all other pending motions. ER5-6. It then gave Ms. Grizzell a brief window during which to file a second amended complaint through licensed counsel, which Ms. Grizzell was unable to do. ER5; *see* ER520.

Ms. Grizzell appealed to this Court. ER520. She promptly moved to proceed *in forma pauperis* and filed an opening brief. Dkts.2-3. The Court filed an order questioning whether the appeal might be frivolous and ordered Ms. Grizzell to show cause to the contrary. Dkt.6. In response, Ms. Grizzell stated, among other things, that she was denied due process in the district court, Dkt.7 at 2; that she was barred

from moving to serve as guardian *ad litem*, *id.* at 4; and that she had capacity to sue as "representative of the child," *id.* She further explained that "parents of a minor," unless legally deprived of "their parental rights," "are able to file a lawsuit" on their children's behalf because "[t]hey are the primary people responsible" and "have an inherent right to protect and represent their children." *Id.* at 7. And Ms. Grizzell elaborated that a child can "enforce [his] own legal rights in a civil case as long as they do so through a guardian *ad litem*." *Id.* (citing Cal. Fam. Code. §§6600-6601). The District opposed, again citing *Johns*. Dkt.8. Notwithstanding *Johns*, a panel of this Court determined that the appeal "involves non-frivolous issues"; granted Ms. Grizzell *in forma pauperis* status; and ordered the case to proceed. Dkt.11. After full briefing, the Court determined that "*pro bono* counsel would benefit the court's review" and appointed the undersigned for purposes of appeal. Dkts.22-23. This opening brief replaces Ms. Grizzell's first. *See* Dkt.23.

## SUMMARY OF ARGUMENT

This Court should overrule *Johns*, which was wrong the day it was decided and has shut an untold number of minors out of the courts, no matter how egregiously their rights have been violated or how meritorious their claims may be. It is not even clear whether *Johns* purported to be interpreting any particular law, which begs the question to what extent it is even entitled to deference under *stare decisis* principles.

But in all events, those principles confirm that the case should be sent to the precedential scrapyard.

First, *Johns* is egregiously wrong. The right to "conduct" one's case "personally" has been continuously protected by statute since 1789, and the same relevant language from the first Judiciary Act appears in 28 U.S.C. §1654. That has long been understood to include the right to proceed *pro se*. Minors are entitled to the same litigation rights as adults, except that they typically must appear by and through their guardians. There is thus no reason to think §1654 deprives minors of the right to have their cases conducted *pro se* by those who are entitled to act on their behalf. Nor does anything in California law suggest any such constraint that §1654 might incorporate. To the contrary, state law empowers guardians to exercise the full right to "conduct" the case as principal, Cal. Fam. Code §6601, subject only to court oversight of their decisions for the protection of the minor. The right to conduct litigation includes all procedural rights that could be exercised by the minor himself because the guardian "stand[s] in the role of the client." *In re M.F.*, 74 Cal.Rptr.3d 383, 388 (Cal. Ct. App. 2008). The power of the guardian to "conduct" the case under California law, Cal. Fam. Code §6601, thus plainly includes the power to "conduct" the case "personally," 28 U.S.C §1654.

The two arguments *Johns* offered in support of its contrary conclusion are baseless. First, the Court analogized the role of a parent standing in the shoes of her

child as principal to that of an attorney advocating on a minor's behalf. That comparison is wrong on its face, and it diminishes the role of the parent in service of imposing a sweeping, across-the-board judicial power to supersede parents' choices in favor of the courts'. Second, the Court contended that a minor has no "true choice" to proceed *pro se*. 114 F.3d at 876. But the Court provided no explanation for depriving *parents* of that choice when they are conducting a case on behalf of their children. Indeed, by that logic, parents could be deprived not just of the right to conduct their children's claims *pro se*, but even to do so *by counsel*—a nonsensical result.

*Johns* not only finds no purchase in §1654, but produces patently unconstitutional results. It violates parents' fundamental rights to direct the upbringing of their children, and to do so through the right of self-representation that was prized by the Framers and enshrined in the Constitution's guarantee of due process of law. It abridges the due process and equal protection rights of indigent children by denying them entry through the courthouse gates simply because their parents cannot afford an attorney. And it runs roughshod over the equal protection guarantee for all children by denying them the same procedural rights afforded to adults.

The punitive and unjustifiable consequences of the *Johns* rule likewise weigh heavily in favor of overruling it. *Johns* asserted that it is in "the interest of minors

or incompetents" to always be represented by counsel.  114 F.3d at 876.  But that conclusion assumes the premise (at a minimum) that all minors *can* be represented by capable attorneys for all their legal needs.  That is fantasy, not law.  *Johns* makes the perfect the enemy of the good by blanketly refusing to allow *pro se* parent suits.  And *Johns*' protectionist instincts run counter to foundational principles embedded in law, which assume that parents, not courts, are best suited to make choices for their children unless and until clearly proven otherwise.  *Pro se* parent suits are already subject to case-specific safeguards—not across-the-board prohibitions—to protect minors and facilitate uncounseled litigation.  Moreover, the *Johns* rule does not even make sense on its own terms, for even with counsel parents still have the power to make the most important decisions in litigation, including whether to bring suit at all.  And the illusory alternative raised by the *Johns* court—that a minor can simply wait until he turns 18 to sue—inexplicably ignores the default rule that statutes of limitations continue to run during minority, and in any event leaves children to suffer irreparable harms in the interim.

Finally, *en banc* hearing is warranted because *Johns* directly conflicts with the decisions of several other circuits.  A recent Fifth Circuit case, *Raskin v. Dallas Indep. Sch. Dist.*, 69 F.4th 280 (5th Cir. 2023), expressly rejected *Johns* in favor of looking to state law to determine whether a parent is empowered to exercise her child's *pro se* right.  Other circuits' decisions also squarely conflict with *Johns* by

treating the need for counsel as a flexible standard rather than a hard-and-fast rule, or by carving out multiple functional exceptions depending on the type of case.

The issue is exceptionally important for the Grizzells and plaintiffs like them, who thanks to *Johns*—and *Johns* alone—are left without any remedy at all for clear, otherwise-redressable violations of their rights. This Court has the power and the duty to correct its error. It should hear this case *en banc* and reverse.

## STANDARD OF REVIEW

Conclusions of law are reviewed *de novo*. *Key Bank of Wash. v. S. Comfort*, 106 F.3d 1441, 1442 (9th Cir. 1997).

## ARGUMENT

### I.     *Johns* Must Be Overruled.

*Johns* should be discarded because it is wrong and violates the law. Indeed, *Johns* is entitled to minimal, if any, respect under the traditional *stare decisis* factors, as it imposes a judge-made rule that does not purport to derive from, or otherwise implement, any statutory or constitutional provision. *See Pearson v. Callahan*, 555 U.S. 223, 234 (2009) (*stare decisis* is "out of place" outside the context of "constitutional or statutory precedent"); *see also, e.g.*, *Ramos v. Louisiana*, 140 S.Ct. 1390, 1412-13 & n.2 (2020) (Kavanaugh, J., concurring). Rather, *Johns* enforced a rule a of judicial practice, based on what it saw as the "interest of minors" and the proper "limiting [of the] legal representation of others to licensed attorneys authorized to practice before the court." *Johns*, 114 F.3d at 876-77; *accord, e.g.*,

*Elustra v. Mineo*, 595 F.3d 699, 704 (7th Cir. 2010) (explicitly grounding counsel rule in "inherent authority" of federal courts); *Cheung*, 906 F.2d at 61 (embracing "policy" of excluding non-lawyers from courts on theory that no law entitles a parent to *pro se* representation for a child).

To abandon *Johns*' misplaced holding thus would not be to reject past understandings of "bedrock principles … founded in the law." *Vasquez v. Hillery*, 474 U.S. 254, 265-66 (1986). It would instead be more akin to approving a revision to the local rules—a decision over which a panel has no say. *See* Fed. R. App. P. 47 (reserving amendments for the full Court). Of course, *Johns* also maintained that the rule it embraced did not *violate* the U.S. Code, *see* 114 F.3d at 876 (a point on which it was mistaken, *see infra*). But rejecting a judge-made command because it is in fact unlawful would still be just an exercise of the Court's inherent power. Indeed, the Court may revise its working practices simply because it has a "body of new experience to consider regarding the consequences of requiring adherence to [its] inflexible procedure"; *a fortiori* it may do so when its past practice raises grave statutory and constitutional doubts. *Pearson*, 555 U.S. at 234.

Moreover, any *stare decisis* effect is "reduced" in "the case of a procedural rule such as this, which does not serve as a guide to lawful behavior." *United States v. Gaudin*, 515 U.S. 506, 521 (1995). The counsel mandate imposed by *Johns* is not the type of rule that engenders serious, if any, reliance interests on primary conduct.

*See Payne v. Tennessee*, 501 U.S. 808, 828 (1991) ("Considerations in favor of *stare decisis* are at their acme in cases involving property and contract rights, where reliance interests are involved[;] the opposite is true in cases such as the present one involving procedural and evidentiary rules." (citations omitted)). No one has relied on *Johns* to structure their primary conduct; and if they did, they could have done so only by willfully violating the rights of minors in the expectation that *Johns* would render those minors unable to mount an otherwise meritorious lawsuit in response. That is hardly justified reliance.

In all events, even if the strictest *stare decisis* standards were to apply, *Johns* deserves to be overruled.

### A. *Johns* Is Egregiously Wrong.

*Johns* is not just wrong, but "egregiously wrong." *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2265 (2022). The rule it adopted is irreconcilable with federal and state law, and it raises grave constitutional doubts to boot.

### 1. Federal and state law keep the courthouse doors open to children even when their parents cannot afford an attorney.

"Since the First Judiciary Act in 1789, every person—including a minor—has enjoyed a right to litigate *pro se* in federal court." *Raskin*, 69 F.4th at 287 (Oldham, J., dissenting in part and concurring in the judgment); *Iannaccone v. Law*, 142 F.3d 553, 556 (2d Cir. 1998) ("[T]he right to self-representation has remained constant for over 200 years."). Title 28 of the U.S. Code, like the first Judiciary Act,

guarantees a right to proceed "personally or by counsel," as the "part[y] plead[ing] and conduct[ing]" his "own case[]" sees fit. 28 U.S.C. §1654; *accord* Judiciary Act of 1789, ch. 20, §35, 1 Stat. 73, 92; *see Faretta*, 422 U.S. at 812 (explaining that this provision grants "the right of self-representation"). That self-representation power granted by the Judiciary Act "is a right of high standing, not simply a practice to be honored or dishonored by a court depending on its assessment of the desiderata of a particular case." *O'Reilly v. N.Y. Times Co.*, 692 F.2d 863, 867 (2d Cir. 1982). Whenever a party brings a case, he has an unyielding right to do so by himself, without a lawyer.

Children's legal claims are generally no different, with one exception: Minors typically cannot "conduct" their own cases because they lack "legal capacity to initiate or maintain a legal action" themselves. 43 C.J.S. *Infants* §398 (2023 update). Minors are not completely barred, however, from bringing their otherwise viable legal claims. Rather, a "general guardian," "next friend," or "guardian ad litem" "may sue or defend on behalf of [the] minor." Fed. R. Civ. P. 17(c); *see Penhallow v. Doane's Adm'rs*, 3 U.S. (3 Dall.) 54, 106 (1795) (opinion of Iredell, J.) ("The infant cannot act for himself, and therefore is allowed to act by his guardian."); *Smith v. Org. of Foster Fams. for Equality & Reform*, 431 U.S. 816, 841 n.44 (1977) ("[C]hildren usually lack the capacity" to assert their rights, "and thus their interest is ordinarily represented in litigation by parents or guardians."). In turn, to determine

an adult's power to sue in that "representative capacity" on the minor's behalf, a court looks at the capacity of the adult—most typically, the minor's parent—under the "law of the state where the court is located." Fed. R. Civ. P. 17(b)(3).

In all jurisdictions, "[a]bsent unusual circumstances, parents are entitled to bring lawsuits on behalf of their children," though the nominal form of the representation—*i.e.*, "whether they do so as general guardians or as next friends or guardians *ad litem*"—"depends on the vagaries of state law." Nancy J. Moore, *Conflicts of Interests in the Representation of Children*, 64 Fordham L. Rev. 1819, 1828-29 (1996) (footnotes omitted). California is no exception. To initiate a lawsuit on behalf of a child, a parent typically proceeds as a guardian *ad litem*. Cal. Code Civ. Pro. §372(a)(1).[10] Absent a conflict of interest, the parent has a "right to be selected as guardian ad litem for the parent's child," *C.D. v. S.L.*, 2022 WL 481259, at \*9 (Cal. Ct. App. Feb. 17, 2022), and the appointment "is usually made on application only and involves little exercise of discretion," *In re Marriage of*

---

[10] The district court denied Ms. Grizzell's motion to become guardian *ad litem* "as unnecessary" because, in its view, Ms. Grizzell could simply proceed in a representative capacity as "general guardian" under Federal Rule of Civil Procedure 17(c)(1)(A). ER6. It is immaterial whether the district court appoints the parent as guardian *ad litem* under Rule 17(c)(2) or treats her as a general guardian under Rule 17(c)(1) because, in either event, capacity is determined by state law. *See* Fed. R. Civ. P. 17(b); 6A Wright & Miller, Fed. Prac. & Proc. Civ. §1571 (2023 update); John E. Kennedy, *Federal Rule 17(b) and (c): Qualifying to Litigate in Federal Court*, 43 Notre Dame L. Rev. 273, 281, 293-94 (1968).

*Caballero*, 33 Cal.Rptr.2d 46, 51 (Cal. Ct. App. 1994).  That is because in California, as elsewhere, "parents have the right to determine if and when their child should bring a civil lawsuit."  *Williams v. Superior Court*, 54 Cal.Rptr.3d 13, 25 (Cal. Ct. App. 2007).  Indeed, absent "egregious" circumstances, it is "the parents, not the courts" that "make decisions for the minor," including "[t]he decision to file [an] action."  *Aronson v. Superior Court*, 236 Cal.Rptr. 347, 351 (Cal. Ct. App. 1987).

A parent, proceeding as guardian *ad litem*, has the full power to "conduct" the litigation on behalf of the minor, exercising all the "minor's rights" in the "civil action … in the same manner as an adult."  Cal. Fam. Code §6601; *see also, e.g.*, Robert I. Weil et al., Cal. Practice Guide: Civil Procedure Before Trial ¶2:83 (minors lack capacity to sue in their own names and must conduct litigation through guardian or guardian *ad litem*).  That is a "sweeping power[]" allocated to the guardian over "the conduct of the case."  *De Los Santos v. Superior Court*, 613 P.2d 233, 237 (Cal. 1980); *see also United States v. 30.64 Acres of Land*, 795 F.2d 796, 805 (9th Cir. 1986) ("A guardian ad litem is authorized to act on behalf of his ward and may make all appropriate decisions in the course of specific litigation.").  The guardian has "the right to control the litigation on behalf of the incompetent person," *In re Christina B.*, 23 Cal.Rptr.2d 918, 926 (Cal. Ct. App. 1993), including the right to "compromise or settle the action," "to control the procedural steps incident to the conduct of the litigation," and "to make stipulations or concessions that are binding on the minor,"

*De Los Santos*, 613 P.2d at 237. A guardian also "has the power to evaluate the child's best interests and authorize a motion to dismiss" the child's case altogether, *In re Josiah Z.*, 115 P.3d 1133, 1140 (Cal. 2005), and "has the legal power to waive a jury trial," *Cloud v. Market St. Ry. Co.*, 168 P.2d 191, 198 (Cal. Ct. App. 1946). In other words, for all purposes, due to the minor's incapacity, the guardian "stand[s] in the role of the client." *M.F.*, 74 Cal.Rptr.3d at 388.

To be sure, the guardian is *not* the client, which is why certain actions require the involvement of the court—*e.g.*, courts must approve settlements, Cal. Code Civ. Pro. §372(a)(3); ensure that "stipulations or concessions" are not "prejudicial to the [minor's] interests," *De Los Santos*, 613 P.2d at 237; and prevent "fundamental rights, including the right to trial," from being "compromise[d]" "without some countervailing and significant benefit," *Christina B.*, 23 Cal.Rptr.2d at 926. But the guardian's role is fundamentally "*more than an attorney's*." *County of Los Angeles v. Superior Court*, 111 Cal.Rptr.2d 471, 477 (Cal. Ct. App. 2001) (emphasis in original). That is because unlike an attorney, a guardian can make not only "tactical," but also "fundamental decisions affecting the litigation … with the interest of the minor in mind." *Id.* And much like a client, "the guardian" in fact "oversees any attorney representing [the] minor's litigation-related interests." *Id.*

The guardian thus assumes the child's rights to conduct the litigation—all of them. That includes the right either to conduct the litigation *pro se*, or to "oversee[]"

any attorney" she may retain for the child. *Id.*; *see* 28 U.S.C. §1654. State law "lodges that capacity" in the parent, *Raskin*, 69 F.4th at 293 (Oldham, J., dissenting in part and concurring in the judgment), because the guardian "control[s] the procedural steps incident to the conduct of the litigation," *De Los Santos*, 613 P.2d at 237; *see Cloud*, 168 P.2d at 197. Nothing in the otherwise complete power to "conduct" the litigation implicitly exempts the power to conduct the case *pro se*.[11]

## 2. *Johns*' cursory reasoning to the contrary is indefensible.

*Johns* did not invoke the counsel mandate through its own reasoning. Instead, *Johns* hung its holding on a Third Circuit case, *Osei-Afriyie v. Medical College*, 937 F.2d 876 (3d Cir. 1991), and a few sparse sentences of conclusory assertions. Those arguments do not hold water.

---

[11] While one California intermediate appellate court concluded that a parent acting as a child's guardian ad litem could not represent her child *pro se*, *see J.W. v. Superior Court*, 22 Cal.Rptr.2d 527, 528, 533 (Cal. Ct. App. 1993), that decision is at odds with the "sweeping powers enjoyed by … guardian[s] ad litem" under California law, *De Los Santos*, 613 P.2d at 237. It also produces the same unconstitutional results as the rule embraced in *Johns*, as California has no more power than Congress or this Court to deprive minors to access to the courts just because they cannot afford attorneys. *See infra* Part I.A.3. In all events, whether California specifically recognizes the power of guardians to represent their children *pro se* is beside the point, as §1654 itself affords that power to anyone a state deems competent to "conduct" a minor's case for them, which California law plainly does here. 28 U.S.C. §1654; *see Raskin*, 69 F.4th at 292-93 (Oldham, J., dissenting in part and concurring in the judgment). But even if California law mattered, that would hardly be a reason to continue to enforce a blanket prohibition on *pro se* actions regardless of state law. *See id.* at 282-83, 285 n.5 (majority opinion) ("On remand, the district court is free to address this issue of Texas law in the first instance[.]"); *cf.* Cal. R. Ct. 8.548.

*First*, the Court was wrong to equate a "parent … bring[ing] a pro se lawsuit on behalf of a minor" with representation of a plaintiff by a nonlawyer. *Johns*, 114 F.3d at 877. That erases the distinction between the power to *conduct* a lawsuit, which both federal and state law vest in the guardian, and the ability to merely *represent in court* a party conducting the lawsuit herself. A guardian acts in a representative capacity only in the sense that she "stand[s] in the role of the client" for a legally incompetent plaintiff, not in the sense that she serves as counsel. *M.F.*, 74 Cal.Rptr.3d at 388. Indeed, as stand-in principal, the guardian "*oversees* any attorney," *Los Angeles*, 111 Cal.Rptr.2d at 477 (emphasis added), or proceeds *pro se* on her own. She has the power to initiate the litigation; to settle it; to dismiss it; and to set its strategic, not just merely tactical, objectives—all roles characteristic of the client, not a lawyer. *See* Model R. Prof. Cond. 1.2(a), 1.16(a)(3); *see also Los Angeles*, 111 Cal.Rptr.2d at 476 ("[I]ndependent counsel, no more than any other provider of a specialized service, such as a doctor, dentist, or therapist, does not, and cannot, represent a minor's interests in the same way, and as to the same scope, as either a parent or guardian."). That is not the practice of law, but rather something much more: the fulfillment of a power California law vests in a guardian to "conduct" the litigation on the minor's behalf, Cal. Fam. Code §6601—a power that federal law in turn allows her to execute *pro se* in federal court, 28 U.S.C. §1654.

The *Johns* Court also erred in a more fundamental—and more egregious—way by diminishing the role of a parent's prosecution of claims on behalf of her child. In particular, the Court justified its one-size-fits-all approach by asserting that an "infant is always the ward of every court wherein his rights or property are brought into jeopardy." 114 F.3d at 877 (quoting *Osei-Afriyie*, 937 F.2d at 883). That sweeping proposition not only would mean (as *Johns* held) that a parent can *never* be trusted to represent her child's interests without interposing an attorney, but would seemingly trump all *pro se* parents' decisions in every case. "The statist notion that governmental power should supersede parental authority in all cases" simply because some parents fall short is "repugnant to American tradition." *Parham v. J.R.*, 442 U.S. 584, 603 (1979) (emphasis omitted). It is also anathema to the foundational principle that "[t]he child is not the mere creature of the state." *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925); *see also* Martin, *supra*, at 865 ("Placing parents in the box of 'wanna-be attorney' for child litigants allows courts to frame the counsel mandate as simply a matter of courtroom procedure and ignore its implications upon parental authority.").

Courts are empowered to protect the minors who litigate before them, but they do so by overseeing, examining, and approving guardian actions that may affect substantial rights, *see supra* p.28, not by usurping litigation authority for themselves. And in cases where there is conflict between parent and child, the court can appoint

a different guardian *ad litem*. *See Williams*, 54 Cal.Rptr.3d at 25 (a parent with a "conflict of interest" is not entitled to "select the guardian ad litem or control … legal decisions …."); *cf. Bank of the United States v. Ritchie*, 33 U.S. (8 Pet.) 128, 144 (1834) (noting that "[i]n all suits brought against infants, … [t]hey defend by guardian to be appointed by the court, who is usually the *nearest relation not concerned*, in point of interest, in the matter in question" (emphasis added)). But until such a determination is made, a parent with "[s]ole legal custody" has "the right and the responsibility to make the decisions relating to the health, education, and welfare of a child." Cal. Fam. Code §3006; *see Aronson*, 236 Cal.Rptr. at 351 (court is not "inclined, or authorized, to take over the decisions relative to the care of minors," including litigation decisions, absent "egregious situations calling for interference with legal custody").

*Second*, while Johns was certainly correct that whether to proceed *pro se* may not be a "true choice for minors" who lack capacity to sue themselves, *Johns*, 114 F.3d at 876-77 (quoting *Osei-Afriyie*, 937 F.2d at 883), that is no basis for depriving *parents* of the right to make that choice on their children's behalf, as the law entitles them to do. State law gives that right—expressly, the right to "conduct" the litigation—to the guardian. Cal. Fam. Code §6601.

*Johns* seemingly read §1654 as inapplicable because the child himself or herself could not "personally" "conduct" his "*own*" action. 28 U.S.C. §1654

(emphasis added).  But there is no basis for excluding the §1654 right to conduct the litigation "personally" from the bundle of rights transferred to the parent, and absurd results would follow from doing so.  The text of §1654 provides two—and only two—alternatives by which one may "conduct" her case:  "personally" or "by counsel":

> In all courts of the United States[,] the parties may plead and conduct their *own cases personally or by counsel* as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.

28 U.S.C. §1654 (emphasis added).  If a child is empowered by §1654 to conduct her case in either fashion, the child's parent is likewise entitled to exercise either option.  Indeed, if a parent could not conduct her child's "own" case *personally*, then it would follow that she could not even conduct her child's "own" case *by counsel*.  But *everyone* agrees that a parent can retain counsel as a means of "conducting" the action on behalf of a minor—including the *Johns* Court, which *requires* parents to do so.  And rightly so, as reading §1654 so restrictively as to preclude the guardian from conducting the action at all would run headlong into historical tradition, Rule 17(c), California law, and common sense.  The right interpretation, and the only sensible one, is that (1) §1654 empowers the child to "conduct [his] own case personally or by counsel," and (2) state law, by vesting in the parent the power to "conduct" the case for the child, vests in the parent the power to conduct the child's claims "personally or by counsel."

The fact that corporations, partnerships, and other artificial legal entities must proceed through counsel does not alter that result in the slightest. *Johns* and other courts reflexively invoked cases involving such entities to justify their mandate. *See, e.g.*, *Johns*, 114 F.3d at 876 (relying on rule for trusts in *C.E. Pope Equity Tr.*, 818 F.2d 696); *Shepherd v. Wellman*, 313 F.3d 963 (6th Cir. 2002) (relying on rule for estates); *Cheung*, 906 F.2d at 61 (relying on rule for corporations). But a child is fundamentally different from a corporation, partnership, or estate for myriad reasons, not least of which because a child is a natural person. Artificial legal entities cannot proceed *pro se* because they do not possess the right (or physical ability) to proceed "personally" at all. *That* is why "28 U.S.C. §1654, providing that 'parties may plead and conduct their own cases personally or by counsel,' does not allow corporations, partnerships, or associations to appear in federal court otherwise than through a licensed attorney." *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 202 (1993) (relying on *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 830 (1824)). Thus, even if a natural person is authorized to conduct the litigation on a corporation's behalf, he cannot exercise the corporation's right to proceed *pro se* because no such right exists. But, as the Court has explained, natural-person parties are different: The class of people who can appear *pro se* is "natural person[s]," *Osborn*, 22 U.S. at 830, and "natural persons only," *Rowland*, 506 U.S. at 203. By extending the counsel mandate for corporations to minors and incompetent persons, *Johns* creates

a "special class of litigants"—unique among natural persons—who cannot litigate "without engaging professional counsel to do so for them." *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 285-86 (2d Cir. 2005). To say the least, that is "in some tension with the general notion that a person may appear in court without the benefit (or expense) of professional assistance." *Id.* at 286.

### 3. *Johns* violates the constitutional rights of parents and minors.

*Johns* did not consider the constitutional problems inherent in its counsel mandate.[12] But *Johns* abridges the constitutional rights of parents and children alike.

***Parents' Rights.*** A parent's interest in the "care, custody, and control" of her child is "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The counsel mandate tramples that interest, restricting parents' right to manage their children's affairs by conducting their children's legal claims. The Supreme Court has long recognized that "the relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978). That protection extends to "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child," regardless of whether the state thinks they have "been model parents." *Santosky v. Kramer*, 455 U.S. 745,

---

[12] The Court disposed only of a Free Exercise claim regarding a parent's asserted religious responsibility to care for his child, relying on *Employment Division v. Smith*, 494 U.S. 872 (1990). *See Johns*, 114 F.3d at 877.

753 (1982); *see Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce*, 268 U.S. 510. And it prohibits government from implementing "[t]he statist notion that [its] power should supersede parental authority in all cases." *Parham*, 442 U.S. at 603.

These rights are especially critical in the context of self-representation as a means of vindicating children's claims. In *Faretta*, 422 U.S. 806, the Supreme Court recognized a "right of self-representation" grounded in the Founding Era rejection of the policies of the infamous sixteenth-century English Star Chamber, which imposed a requirement of "obligatory counsel." *Id.* at 821, 823. Although the Court grounded the right there in the Sixth Amendment, its reasoning makes clear that the self-representation right found in §1654, a right of which the Court had taken "past recognition," has a "constitutional dimension" in civil cases as well. *Id.* at 817; *see also Iannaccone*, 142 F.3d at 556 ("The framers of our Constitution thought self-representation in civil suits was a basic right that belongs to a free people."). The *Faretta* Court began its analysis by citing §1654 itself, noting that "the right of self-representation has been protected" since the Judiciary Act of 1789. 422 U.S. at 812. It also relied on circuit precedent grounding the right in both the Sixth Amendment and the "Fifth Amendment's guarantee of due process of law," *id.* at 817 (citing *United States v. Plattner*, 330 F.2d 271, 274 (2d Cir. 1964)). The Sixth Amendment, guaranteeing "assistance" of counsel, does "not state[] … in so many words" but rather "*implies* a right of self-representation," *id.* at 819, 821 (emphasis added), most

naturally found in the right to due process, U.S. Const. amend. V.  In all events, in combination with parents' right to conduct their children's affairs, denying parents the right to appear *pro se* simply because they are doing so as parents violates a fundamental constitutional guarantee.

In this regard, the *Johns* rule "plainly defies … centuries of Anglo-American law dating as far back as the Magna Carta."  *Raskin*, 69 F.4th at 294 (Oldham, J., dissenting in part and concurring in the judgment).  "By the middle of the thirteenth century, lawyers so monopolized the courts in London that the King was forced to decree that, except for a few special causes, litigants were entitled to plead their own cases without lawyers."  *Iannaccone*, 142 F.3d at 557 (citing Note, *The Right to Counsel in Civil Litigation*, 66 Colum. L. Rev. 1322, 1325 (1966)).  The Founding generation gave the "right of self-representation" even "more fervent" force, grounded in deep "virtues of self-reliance and a traditional distrust of lawyers." *Faretta*, 422 U.S. at 826.  Indeed, several early Colony codes *prohibited* the paid retention of lawyers in civil cases.  *Id.* at 827 (citing Mass. Body of Liberties art. 26 (1641)).  "[E]ducation and literacy of colonial Americans … transformed the average American into a citizen-lawyer," *Iannaccone*, 142 F.3d at 558, so that "the basic right of self-representation was never questioned," *Faretta*, 422 U.S. at 828.  In defending the 1776 Pennsylvania Declaration of Rights, for example, Thomas Paine explained that self-representation right would be retained notwithstanding a provision

guaranteeing counsel because a party "has a natural right to plead his own cause." *Id.* at 830 n.39 (quoting Thomas Paine on Bill of Rights (1777)).

The civil right to sue personally—which has persisted unaltered "for over 200 years," *Iannaccone*, 142 F.3d at 556—took on special force in Reconstruction, and so has particular significance for black Americans bringing claims to remedy racist wrongs. Section 1 of the Civil Rights Act of 1866, in a direct response to *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), expressly included provisions regarding capacity to sue, guaranteeing "the same right, in every State and Territory in the United States … *to sue* … as is enjoyed by white citizens." Civil Rights Act of 1866, ch. 31, §1, 14 Stat. 27, 27 (emphasis added); *see* Akhil Reed Amar, *Women and the Constitution*, 18 Harv. J.L. & Pub. Pol'y 465, 468 (1994) (explaining that the basic "civil rights" protected by the Fourteenth Amendment included equal rights in the capacity "to sue and be sued"). That is because "[t]he right to sue and defend in the courts … is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship." *Chambers v. Balt. & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907). *Johns* abridges the right of parents to exercise that right on behalf of their children.

***Children's Rights.*** Under *Johns*, whether a minor can file suit turns on one thing: the wealth of his parents. That raises a host of constitutional problems. "[T]he right of access to the courts" is "protected by the Due Process Clause."

*Tennessee v. Lane*, 541 U.S. 509, 523 (2004). By eliminating that access for any child whose parents cannot afford an attorney, *Johns* denies those children equal protection of the laws. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996). In effect, the counsel mandate relegates to second-class status the civil rights of poor children—a result as unconscionable as it is unfounded.

Moreover, *all* minors, not just poor ones, are denied equal protection under *Johns*. In *In re Moore*, the Supreme Court considered the authority of a next friend suing for an infant,[13] specifically whether a next friend had the authority to exercise certain venue-selection rights. 209 U.S. 490, 497 (1908), *abrogated on other grounds by Ex parte Harding*, 219 U.S. 363 (1911). In explaining that the power to do so was "clear," *id.* at 496, the Court approvingly cited *Raming v. Metropolitan Street Railway Co.*, 57 S.W. 268 (Mo. 1900). Because a "next friend is neither the agent nor attorney for his ward," but rather a court-approved stand-in principal, *Raming* explained, he "has authority to do every act which the interest of the infant demands and the law authorizes." *Moore*, 209 U.S. at 499 (quoting *Raming*, 50 S.W. at 275). Thus, were the relevant "statute … to be considered so strictly as to deny the next friend the authority to make an application for a change of venue," that

---

[13] Historically, courts denoted those suing for infant plaintiffs as "next friends" and those defending for infants as "guardians *ad litem*." The distinction has since been abrogated, and the two terms are now used interchangeably. *See* Wright & Miller, *supra*, §1572 & n.3.

would "necessarily deny to infants, who are unable to act for themselves, the equal protection with other litigants," which "would raise a serious question as to the validity of the statute itself." *Id.* The upshot of *Moore* and *Raming* is clear: Children cannot be deprived of the procedural rights afforded adults just because they must conduct litigation through guardians.

## B. *Johns* Leads to Punitive and Bizarre Results, Especially for Poor Children.

It is bad enough that *Johns* cannot be reconciled with statutory and constitutional law. But the rule it adopted is not even good policy. To the contrary, as this case well illustrates, it produces exactly the kinds of incredibly "damaging consequences," *Dobbs*, 142 S.Ct. at 2243, that readily justify reconsideration.

### 1. *Johns*' extralegal policy rationales make an unattainable perfect the enemy of the good.

*Johns* seized from parents the decision of whether a challenge should proceed *pro se* by relying on the courts' traditional policy justifications for limiting advocacy to members of the bar. Even on their own terms, those policy justifications are far afield in this context.

*Johns* proclaimed that "[i]t goes without saying that it is not in the interest of minors or incompetents that they be represented by non-attorneys." 114 F.3d at 876 (quoting *Osei-Afriyie*, 937 F.2d at 883). In fact, that glib assertion blinks reality. Even granting that counseled plaintiffs are always more skilled than ones proceeding

*pro se* (a dubious presumption), at the risk of stating something that should even more obviously go without saying, many people proceed *pro se* not because that is their preference, but because they cannot afford an attorney.  *Johns* assumed that it is in the interest of minors to proceed with counsel because children are "*entitled* to trained legal assistance so their rights may be fully protected," *id.* at 877 (emphasis added), but it simply ignored the problem that no such entitlement exists, *see Palmer*, 560 F.3d at 970.  Nor is that a problem that society has solved through voluntary action; to the contrary, of those who are low-income, 86% receive "inadequate or no legal help" on their civil legal problems.  L. Servs. Corp., *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans* 6 (June 2017). *Johns* thus functionally acts as a bar on litigation altogether for the vast majority of low-income children—a group that is itself disproportionately overrepresented among the low-income population, *see* Martin*, supra*, at 856.

The *Johns* fallacy rears its head most clearly when plaintiff parents attempt to take a court up on *Johns'* supposed offer.  In *Duarte v. Figueroa*, 2006 WL 708994 (N.D. Cal. Mar. 21, 2006), for example, the court concluded that because the claims at issue were "not complex" and that the *pro se* plaintiff parent had adequately framed the issues for the court thus far, appointment of counsel was "not required." *Id.* at *2.  But in *the very next sentence*, the court concluded that it had to dismiss the case for lack of counsel anyway because, under *Johns*, "[p]laintiff cannot

represent his minor son in this action." *Id.* That same irony was on full display in *Cheung*, 906 F.2d 59, in which the Second Circuit first noted that the right to proceed *pro se* should not be "honored or dishonored by a court depending on [a court's] assessment" of the case. *Id.* at 61. The court nonetheless then approved of dismissal of a parent's *pro se* suit, leaving the possibility that counsel could be appointed "in appropriate circumstances" but "confess[ing]" its "own view that the facts of [the] case hardly cry out for" it. *Id.* at 61-62.

*Johns* leaves child plaintiffs at the mercy of their parent's fortunes—in both senses of the word. If a guardian is not wealthy enough to pay for counsel or lucky enough to secure *pro bono* assistance, her child's case cannot be brought at all. The implications are hard to overstate. To give just a few examples: John and Mary Beth Tinker brought their suit for an injunction against their Des Moines school's black-armband policy through their father, Leonard. *See Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 258 F.Supp. 971 (S.D. Iowa 1966), *rev'd*, 393 U.S. 503 (1969). Mark Howlett's suit against his school superintendent for an allegedly unlawful search of his car was initiated by his mother, Elizabeth. *See Howlett v. Rose*, 496 U.S. 356 (1990). A Snapchat-using cheerleader critical of her school filed suit through her parents, Lawrence and Betty Lou Levy. *See Mahanoy Area Sch. Dist. v. B.L.*, 141 S.Ct. 2038 (2021). Under *Johns*, if any of these plaintiffs had been unable to obtain counsel—as the vast majority of low-income people cannot—their cases

never could have been brought at all, let alone eventually reach the Supreme Court. That flies in the face of the principle that everyone, including *pro se* parties, deserves their day in court. The right of a poor American to file a lawsuit is not supposed to be subject to the whims of the *pro bono* bar. Yet that is precisely the system *Johns* has created.

In short, it is emphatically *not* in the interest of minors to be required to proceed by counsel when in practice that means most of them will not be able to file suit at all. The "Hobson's choice" to "litigate with counsel, or don't litigate at all" operates as a lock on courthouse doors for under-resourced minors. *Raskin*, 69 F.4th at 294 (Oldham, J., dissenting in part and concurring in the judgment); *see* Martin, *supra*, at 833 ("[F]ederal courts routinely dismiss children's claims for lack of counsel in the name of protecting children's interests, leaving some of the most vulnerable patrons of the justice system without legal remedies"); Deborah L. Rhode, *Access to Justice*, 69 Fordham L. Rev. 1785, 1804 (2001) ("[C]ourts have failed to address the effects of their own procedural choices in obstructing access to justice … [including] barriers to self-representation … created by the judiciary's own rules and practices.").

There is a better way. "[G]iving everyone a lawyer is an impossible dream[;] less expensive pro se court reform is far more feasible." Benjamin H. Barton & Stephanos Bibas, *Triaging Appointed-Counsel Funding and Pro Se Access to*

*Justice*, 160 U. Pa. L. Rev. 967, 971 (2012). Indeed, "we already live on a *pro se* planet," *Raskin*, 69 F.4th at 286, in which *pro se* litigants are commonplace, and when those litigants have meritorious claims—even if that may be less common than it is for counseled plaintiffs—it is fully within their power to sue, to litigate, and to win. *See* Rebecca L. Sandefur, *Access to What?*, 148 Dædalus 49, 52 (Winter 2019) ("Across a number of common justice problems … nonlawyer advocates and unrepresented lay people have been observed to perform as well or better than lawyers."); Anthony Lewis, *Gideon's Trumpet* (1964) (detailing Clarence Earl Gideon's path to the Court through a *pro se* certiorari petition).

Undoubtedly, *pro se* parent suits leave open an active role for the courts, both because they involve minors and because they are conducted *pro se*. Unsurprisingly, such protections are already built into the structure of federal and state law. Court approval is required to settle a minor's claim, *see* Cal. Code Civ. Pro. §372(a)(3); *accord* S.D. Cal. Local Civ. R. 17.1(a) (magistrate judge review of settlements and compromises on behalf of a minor); a judge must ensure no substantial rights are forfeited by the child's guardian absent corresponding benefits, *see supra* p.28; *cf. also* Fed. R. Civ. P. 55(b)(2) (special court review of proposed default judgments against minors); and a guardian can be replaced if there is a conflict, *see supra* pp.31-32. *Pro se* litigants are entitled to aid from the court in facilitating their suits, most notably through the familiar rule that "[a] document filed *pro se* is to be liberally

construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted). And in appropriate cases, a court can appoint counsel where a party is amenable. *See Agyeman v. Corr. Corp. of Am.*, 390 F.3d 1101, 1103 (9th Cir. 2004). These rules, unlike barricading the courthouse doors to keep *pro se* parents out, protect children's interests and promote just, efficient resolution of their disputes.

Moreover, if trained counsel truly were necessary in every case to protect children from their guardians, it would be inexplicable why the law still vests the most important legal decisions of all—whether to settle, which counsel to retain, whether to bring a claim in the first place—with the child's parent. *See* Model R. Prof. Cond. 1.2(a) (reserving to the client "decisions concerning the objectives of representation" and the "decision whether to settle"); *see also* Cal. Code Civ. Pro. §372(a)(3) (guardian has power to settle); *Williams*, 54 Cal.Rptr.3d at 25 ("[P]arents have the right to determine if and when their child should bring a civil lawsuit."). With or without counsel, parents "conduct," and so for all the most important purposes determine the course of, their children's litigation. Cal. Fam. Code §6601; *see* 28 U.S.C. §1654. That necessarily allows for potentially "harsh" consequences: "[T]he minor must depend upon his legal custodians to protect his interests," and when "they fail to do so" by making "unwise choices" like not filing an action, the

consequences fall on the minor—often before any possibility of court intervention. *Aronson*, 236 Cal.Rptr. at 350-51. But that is the whole point of capacity statutes: They presume that the legal guardian, rather than the statutorily incompetent minor child, has both the child's interests at heart and the intellectual capability to vindicate them, and so empower parents to make all relevant decisions in conducting any litigation. *See id.*; *see also Parham*, 442 U.S. at 602 ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions."). These parents' choices might not be perfect, but the law treats them as being the best among imperfect options, even if "some person would conclude" the opposite: A court is not "well situated to judge the wisdom of the parental choice to sue or not to sue" or to say categorically that "as a matter of law … a lawsuit is always the best use of family resources and energy"; it is not "inclined, or authorized, to take over the decisions relative to the care of minors" absent "egregious situations calling for interference with legal custody." *Aronson*, 236 Cal.Rptr. at 351.

### 2. Minors need not—and often cannot—wait until the age of majority to bring suit.

The *Johns* court's embrace of yet another illusory alternative—that a child can simply wait until the age of majority to bring suit if his parents cannot afford counsel—adds insult to juridical injury. For one thing, the statute of limitations for many causes of action does not toll during infancy. Indeed, the presumption is just

the opposite: The limitations period of a claim does not toll unless "express language" in the statute so provides. *Vance v. Vance*, 108 U.S. 514, 521 (1883); *see, e.g.*, *Booth v. United States*, 914 F.3d 1199, 1205 (9th Cir. 2019) (no tolling during infancy for claims under Federal Tort Claims Act because "[f]ederal courts have consistently applied *Vance*, following minority tolling for federal statutes of limitations only if the statute setting out the limitations period so specifies"); *accord Los Angeles*, 111 Cal.Rptr.2d at 475 ("claimant's minority" and "legal and practical impairment associated with minority" do not "affect the tolling" because parents' knowledge determines accrual); *see also, e.g.*, *Aronson*, 236 Cal.Rptr. 347 (barring a claim for child's injury incurred at time of birth because the limitations period had run before the infant could reach age of majority). The *Johns* court tacitly recognized this reality when, in a footnote, it contended that causes of action "often" provide for tolling. 114 F.3d at 878 n.2. It nonetheless opted to "express no opinion" even on the causes of action at issue *before it in that very case*, apparently because it thought the matter could wait until the plaintiff child was 18 (when, of course, it might already be too late). *Id.*

For another thing, many claims merit not just damages, but also injunctive relief. "Injunctive relief is appropriate" when "monetary damages or other legal remedies will not compensate the plaintiffs for their injuries." *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998); *see Babb v. Wilkie*, 140 S.Ct. 1168, 1178 (2020)

("Remedies generally seek to place the victim of a legal wrong … in the position that person would have occupied if the wrong had not occurred."). By definition, a yearslong delay in justified injunctive relief—after which disputes are often moot, sovereign defendants are immune from paying out damages, and irreparable harms have long ago been suffered—cannot be rectified *ex post*. So it is no answer to say that children can seek such relief *someday* (or depending on the statute of limitations, never at all). Yet neither *Johns* nor the cases on which it relies make any serious effort to engage with their "conflict with one of the basic principles of our legal system—justice delayed is justice denied." *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1095 (9th Cir. 2021).

## II. *En Banc* Review Is Warranted.

A panel decision in this Circuit can be overruled only by the *en banc* Court. *United States v. Hayes*, 231 F.3d 1132, 1139-40 (9th Cir. 2000). *Johns'* irreconcilability with Supreme Court precedent is alone is sufficient to justify *en banc* review. *See* Fed. R. App. P. 35(b)(1)(A). But on top of that, the *Johns* rule conflicts with the rules of other circuits and has been exceptionally consequential. *See* Fed. R. App. P. 35(b)(1)(B). Indeed, a panel of this Court already recognized as much by rejecting the notion that this case is frivolous, Dkt.11, and then appointing counsel, Dkt.22, notwithstanding the binding force of *Johns*. The concern underlying those orders was well-placed.

## A. *Johns* Squarely Conflicts with the Decisions of Other Circuits.

1. The Fifth Circuit has expressly rejected "an absolute bar on *pro se* parent representation" as "inconsistent with §1654" in *Raskin*, 69 F.4th at 282; *see id.* at 285 & n.7 (recognizing that *Johns* implements the absolute bar it rejected). In a well-reasoned opinion, the *Raskin* majority held that a parent can "proceed on behalf of her child in federal court when the child's case is the parent's 'own'" to prosecute. *Id.* at 282. To determine if a claim is the parent's own, *Raskin* held that a court must look to "state law" and determine whether it "affords a parent the right to proceed *pro se*." *Id.* at 284. If so, "the state, in giving a parent this right, assigns to the parent the child's individual choice to proceed *pro se*" and "trusts the parent to represent the child." *Id.* "[T]he parent acts within the parent-child relationship … as the child's *pro se* alter ego." *Id.* Federal law "does not disturb" that assignment, and "Congress left open to states the choice to authorize non-attorney parents to represent their children." *Id.* at 284-85. Unlike the *Johns* Court, *Raskin* noted that "the absolute bar may not protect children's rights at all." *Id.* at 286. And *Raskin* criticized *Johns* and similar cases for "assum[ing], without considering state law, that there is nothing in the guardian-minor relationship that suggests that the minor's interests would be furthered by representation by the non-attorney guardian or apply[ing] an absolute bar without giving any reason" at all. *Id.* at 285 (citation

omitted).  The *Raskin* court remanded for a determination of whether Texas law, applicable in that case, made such an assignment.  *Id.* at 285 n.5.

California law clearly passes that test because it expressly transfers to the guardian the child's power to "conduct" the litigation as she sees fit, Cal. Fam. Code §6601, using the exact term of art—"conduct"—employed by 28 U.S.C. §1654 to grant the power to proceed *pro se*.  Judge Oldham's separate opinion, which went on to apply Texas law and conclude that the parent indeed did have the right to proceed *pro se* "full stop" is particularly instructive in that respect.  Because Texas law qualifies a parent as "a legal guardian qualified to sue on his child's behalf," Judge Oldham explained that it "lodge[d] th[e] capacity" to conduct the case "personally" in the parent, and he found that alone sufficient to entitle the parent to proceed *pro se* under §1654, regardless of whether Texas law expressly conveys that power.  69 F.4th at 293 (Oldham, J., dissenting in part and concurring in the judgment).  His separate opinion, like the majority's, rejected *Johns*, and his conclusion that §1654 itself entitles anyone with the power to "conduct" litigation on behalf of a minor to do so *pro se* is eminently correct.

2. *Johns*' absolute bar also stands out for its unalloyed severity.  Even other circuits that follow something like the *Johns* rule have made ample exceptions.  For example, several circuits have allowed *pro se* parents to proceed in Supplemental Security Income ("SSI") benefits cases brought on behalf of their children.

Recognizing that the general rule "is not ironclad," *Adams ex rel. D.J.W. v. Astrue*, 659 F.3d 1297, 1300 (10th Cir. 2011), these courts note the "alignment of interests between the parent and his or her child in SSI cases, explaining that the child's qualification for benefits impacts the parent's responsibility for expenses associated with the child's condition," *id.* The relationship between parent and child gives the parent "a personal stake in the SSI litigation." *Id.* And because parents bringing these claims are often low-income, denying the *pro se* right would "jeopardize seriously the child's statutory right to judicial review." *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). Courts adopting the SSI exception acknowledge that the *pro se* bar is simply a policy decision that the court has made, *see id.* at 415, and they have determined that other "policy considerations" may "compel" departing from it when necessary to ensure that "the rights of minors" can "be adequately protected," *id.* at 417. Accordingly, they have carved out SSI cases from the "general rule." *Adams*, 659 F.3d at 1300; *accord Harris*, 209 F.3d at 417; *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002).

SSI cases are not *sui generis*; exceptions pervade in other contexts too. In *Murphy v. Arlington Central School District Board of Education*, 297 F.3d 195 (2d Cir. 2002), the court acknowledged that the district court had clearly violated the counsel mandate by allowing parents to proceed *pro se* in an action in the name of their minor son. *Id.* at 201. The court nonetheless declined to enforce the rule on

appeal because it would not be "in the best interest of [the minor] to vacate an injunction that inures to his benefit so that he may re-litigate [the] issue below with licensed representation in order to re-secure a victory already obtained." *Id.* Similarly, in *Elustra v. Mineo*, 595 F.3d 699 (7th Cir. 2010), the Seventh Circuit found "flexibility in the general rule" and permitted consideration of a motion filed by a parent during a month-long window when neither the parent nor the child had counsel. *Id.* at 705-06. "[O]verrid[ing] that action" and striking the motion, the court recognized, would "subvert[] the purpose of the rule" to aid minors "just because the family could not obtain counsel during th[at] short period." *Id.* at 706.

The Second Circuit in particular has distilled these various exceptions into a principle that "the rule that a parent may not represent her child should be applied gingerly." *Tindall*, 414 F.3d at 285; *see id.* ("[T]he rule is not … as absolute as it may seem."). The *Tindall* court noted its skepticism of the counsel mandate for "creat[ing] a special class of litigants" that likened "minors" to "corporations" as incapable of pursuing "an appeal in this Circuit without engaging professional counsel to do so for them." *Id.* at 285-86. The court acknowledged that singling out minors for special, class-wide disfavor among natural persons was "in some tension with the general notion that a person may appear in court without the benefit (or expense) of professional assistance." *Id.* at 286. No doubt, the court acknowledged, the rule "stem[med] largely from [the court's] desire to protect the interests of

minors." *Id.* But the rule "undermine[s] a child's interest in having claims pursued for him or her when counsel is as a practical matter unavailable." *Id.* Indeed, "it may force minors out of court altogether." *Id.* While binding precedent posited that "[t]o allow guardians to bring *pro se* litigation also invites abuse," *id.* (quoting *Cheung*, 906 F.2d at 61), barring the litigation may result "in unredressed violations of children's rights or interests," *id.*

The *Tindall* court's skepticism is well-justified, but its efforts to carve out certain cases amount to only piecemeal justice. The Second Circuit was bound by past panel precedent, but this Court, sitting *en banc*, need not be. The Court should overrule *Johns*, but at a minimum, it should limit its scope to clarify that it need not box plaintiffs like the Grizzells, who have no other option, out of court entirely.

### B. The Issue of Equal Access to the Federal Courts Is Exceedingly Important, Particularly for Plaintiffs Like the Grizzells.

No issue should be more important to a court than who may access it. "American society … bottoms its systematic definition of individual rights and duties, as well as its machinery for dispute settlement, not on custom or the will of strategically placed individuals, but on the common-law model. It is to courts … that we ultimately look[.]" *Boddie v. Connecticut*, 401 U.S. 371, 375 (1971). Courts are charged with "[p]roviding equal justice for poor and rich, weak and powerful alike." *Griffin v. Illinois*, 351 U.S. 12, 16 (1956). The first, absolute minimum step toward achieving that end is not to turn away the poor at the courthouse door. *Johns*

nonetheless precludes *pro se* suits not because guardians lack the means, the will, and the dedication to see a lawsuit to completion on their own, but rather simply because they cannot afford an attorney.

That draconian result has immense importance for everyone, but especially for plaintiffs like the Grizzells. Ms. Grizzell alleges that her three children were subjected to horrifying, demeaning, and racist mistreatment with the tacit acceptance—or even involvement—of their school and school district. *See supra* pp.9-14. Ms. Grizzell spent countless hours communicating her concerns with the District, and she has spent countless more fighting for the mere opportunity to have her case heard. Under *Johns*, that does not matter. The district court was forced to ignore the Grizzells' "serious" allegations, as it was powerless to "change" or "work around the rules" that *Johns* imposes. *See* ER11-12. But this Court is not so constrained. For an *en banc* Court, there is no "those are just the rules" maxim. *Stare decisis*, even if it applies, is "not an inexorable command." *Pearson*, 555 U.S. at 233. The *Johns* rule has no basis in law, it violates the Constitution, and it senselessly abridges the civil rights of our Nation's most vulnerable. Poor children who suffer from injuries cognizable under the law—and who are otherwise fully entitled to legal relief—deserve better. Unless and until the *en banc* Court acts, an unknowable number of plaintiffs like the Grizzells will continue to have no way at

all to pursue their claims, no matter their merit, for no other reason than because lawyers are expensive and their families are poor.

The intentions behind *Johns'* counsel-mandate rule for minors were no doubt noble. It is a worthy goal for all children everywhere to have capable lawyers advising them on how best to pursue legal relief. But in the name of protecting children, what *Johns* has really done is crowd out, in the Grizzells' case and in those of innumerable others like them, *actual* parental guidance and support. Our society trusts that, unless and until it is proven otherwise, parents are the ones charged with protecting the interests, and vindicating the rights, of their children—especially, as is far too common, when no one else will. All Ms. Grizzell seeks is that chance. The laws and Constitution of the United States guarantee her that much, and so should this Court.

**CONCLUSION**

This Court should hear this case *en banc* in the first instance and reverse.

Respectfully submitted,

CARTER C. WHITE
UC DAVIS SCHOOL OF LAW
CIVIL RIGHTS CLINIC
One Shields Avenue, Bldg. TB-30
Davis, CA 95616

s/Erin E. Murphy
ERIN E. MURPHY
 *Counsel of Record*
MARIEL A. BROOKINS*
ZACHARY J. LUSTBADER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Supervised by principals of the firm
who are members of the Virginia bar

*Counsel for Plaintiff-Appellant*

December 4, 2023

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 13,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

December 4, 2023

s/Erin E. Murphy<br>
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy